```
 1                  IN THE UNITED STATES DISTRICT COURT

 2                  IN AND FOR THE DISTRICT OF DELAWARE

 3                              - - -
       HELIOS SOFTWARE, LLC and PEARL      :    CIVIL ACTION
 4     SOFTWARE, INC.,                     :
                                           :
 5              Plaintiffs,                :
       v                                   :
 6                                         :
       SPECTORSOFT CORP.,                  :
 7                                         :    NO. 12-81-LPS
                Defendant.        - - -
 8
                              Wilmington, Delaware
 9                            Tuesday, March 12, 2013
                              Telephone Conference
10
                              - - -
11
       BEFORE:      HONORABLE LEONARD P. STARK, U.S.D.C.J.
12
       APPEARANCES:                   - - -
13

14              YOUNG CONAWAY STARGATT & TAYLOR, LLC
                BY:  MONTE T. SQUIRE, ESQ., and
15                   PILAR G. KRAMAN, ESQ.

16                   and

17              REED & SCARDINO, LLP
                BY:  CABRACH J. CONNOR, ESQ.
18                   (Austin, Texas)

19                        Counsel for Helios Software, LLC and
                          Pearl Software, Inc.
20

21              RatnerPRESTIA
                BY:  REX A. DONNELLY, ESQ.
22
                     and
23

24

25                              Brian P. Gaffigan
                                Registered Merit Reporter
```

1    APPEARANCES:   (Continued)

2

3                    SHARTSIS FRIESE, LLP
                     BY:   JAMES P. MARTIN, ESQ.
                           (San Francisco, California)

4

5                         Counsel for SpectorSoft Corp.

6

7

8                              - oOo -

9                    P R O C E E D I N G S

10                   (REPORTER'S NOTE:  The following telephone

11   conference was held in chambers, beginning at 10:43 a.m.)

12                   THE COURT:  Good morning, everybody.  This is

13   Judge Stark.  Who is there, please?

14                   MR. DONNELLY:  Your Honor, this is Rex Donnelly

15   with RatnerPrestia representing SpectorSoft.

16                   THE COURT:  Okay.

17                   MR. DONNELLY:  With me is James Martin from

18   Shartsis Friese.

19                   MR. MARTIN:  Good morning, Your Honor.

20                   THE COURT:  Good morning.

21                   MS. KRAMAN:  Good morning, Your Honor.  This is

22   Pilar Kraman of Young Conaway representing the plaintiff.

23   With me on the line is Monte Squire and Cab Connor from Reed

24   Scardino.

25                   THE COURT:  Okay.  I have my court reporter with

1   me.  For the record, this is the case of Helios Software LLC

2   v SpectorSoft Corporation, our Civil Action No. 12-81-LPS.

3           We're here to discuss discovery disputes raised

4   by the defendants so we'll hear from the defendant first,

5   please.

6           MR. MARTIN:  Thank you, Your Honor.  This is

7   James Martin of Shartsis Friese for SpectorSoft.

8           SpectorSoft's motion this morning involves two

9   separate parts that I'd like to discuss briefly individually.

10   The first part relates to five accused SpectorSoft products

11   and the second part involves one of plaintiffs' products.

12   And so with the Court's permission, I'd like to start with

13   the SpectorSoft products.

14           THE COURT:  Yes, that is fine.  But let me guide

15   you a little bit.  If you could tell me, you say it's five,

16   they say it's six.  I did want to hear from you on that.

17   And they also now have a proposal whereby they would agree

18   to supplement their charts, so I'm curious as to whether or

19   not that is adequate from your perspective.

20           MR. MARTIN:  Thank you, Your Honor.  If they

21   claim it's six, then that is their contention.  One product

22   that has been accused is a product that doesn't exist, but

23   if they have infringement contentions and they believe it

24   does, we would be happy to take a look at them.

25           With respect to supplementation, I appreciate

1    the fact that they have agreed to supplement, and I

2    obviously would agree that that should happen.  So the key

3    question is what should be contained in those supplemental

4    charts.  So that's what I would like to address briefly this

5    morning.

6                   THE COURT:  Go ahead.

7                   MR. MARTIN:  So I think it's important to have

8    some basic context about the five different products.  And

9    if there is a sixth, we can hear from plaintiffs about what

10   that product is.

11                  But Spector 360, which is the first product, a

12   product for which almost all of the contentions that have

13   been provided relate, Spector 360 is a network product.  It

14   has client server architecture.  It's used typically by

15   businesses to monitor and record their employees' computer

16   usage.  One part of the Spector 360 product is server

17   software that runs on the company servers, and the other

18   part of the 360 product is client software that runs on

19   each user's computers.  Those user's computers are connected

20   to the server over a local network.  So that is the basic

21   architecture of Spector 360.

22                  The second product, Spector Pro, is very

23   different.  It's a consumer product.  It's used primarily on

24   home computers.  Spector Pro does not use client server

25   architecture at all.  There is no server side software.

1    It's typically used on home computers.  For example, a

2    family man would install Spector Pro on a single computer to

3    record all of their children's online activities and then

4    later the parents can go to that computer or view the files

5    saved on that computer to determine what the children were

6    doing online, but there is no network component.

7         eBlaster is also a home product but it operates

8    differently than Spector Pro.  Like Spector Pro, it does not

9    use client server architecture.  eBlaster is installed on a

10   single computer also, but unlike Spector Pro, eBlaster

11   include functionality that will send an e-mail or a text

12   message as an alert if certain triggers occur on a computer

13   that is being monitored.  And there are other differences

14   between eBlaster and Spector Pro.  That software is not the

15   same.  It's different software and it works in a different

16   way.

17        The fourth product, Spector CNE Investigator,

18   is a corporate enterprise product like Spector 360 but,

19   again, it's different than Spector 360 in numerous ways.

20   Its data that is sent back and forth to the server computer

21   is different.  The recorder software on the two -- on the

22   user computers are different.  Spector CNE offers the

23   ability to query a database of the recorded data and that

24   data is sent in a different way.  It's stored in a different

25   way.  And by using CNE Investigator, you can create certain

1    reports and other things that Spector 360 is not capable of

2    doing.  So it's a different product.  It's sold separately,

3    it's coded separately.  And,

4              Finally, eBlaster Mobile is the one they added

5    for the first time when we got their claim charts.  It's a

6    mobile version of eBlaster, and it employs some of the same

7    functionality where if your kids are doing something on a

8    phone, then you can get an e-mail alert or a text alert, but

9    the eBlaster Mobile doesn't run on a computer.  It won't

10   work on a computer.  The code is different than eBlaster,

11   and actually the functionality is, too.  There is a number

12   of things that eBlaster Mobile regulates on the phone that

13   eBlaster doesn't regulate on the computer because you don't

14   make calls on a computer and you don't do the same things

15   on a computer that you do on a phone.  And it's separate

16   software written by different people.

17             So I think the factual background is important

18   because each of these five accused products has been accused

19   of infringement and the infringement claims have to be

20   considered individually.  If a product infringes, that

21   product must satisfy each and every element of at least one

22   of the patent claims.  So if you were to take, for example,

23   claim 1 of the '237 patent, claim 1 of the '237 patent had

24   seven sub-parts, A through G.  It's obvious but plaintiff

25   can't support a claim of infringement by saying claim 1(a)

1   is satisfied by Spector Pro, and claims 1(b) through (d) are

2   satisfied by Spector 360, and (e) through (g) are satisfied

3   by eBlaster.  You have to have, to infringe a single

4   product, it has to satisfy each element of a patent claim.

5          Nor can the plaintiff say here is our chart for

6   Spector 360, go ahead and figure it out for Spector Pro and

7   eBlaster.  You know, you should be able to determine our

8   contentions for Spector Pro and eBlaster by following the

9   same logic we used for 360.

10         But it doesn't work.  I mean I asked myself why

11  have they done it this way?  Why are they opposing the

12  motion?  Why won't they give us separate claim charts for

13  each product individually so one chart for Spector eBlaster

14  includes only the things that are relevant to eBlaster?

15         The reason for that I believe is that if you

16  require the plaintiffs to chart each product separately, I

17  believe it becomes very clear that the products don't

18  infringe.  If you look at claim 1 of the '237 patent, claim

19  1(d), for example.  Claim 1(d) requires that you have a

20  communication session over a network where an access

21  configuration with control settings are exchanged.  We

22  talked about this during claim construction.

23         Well, that makes no sense in the context of

24  Spector Pro or eBlaster or eBlaster Mobile because they are

25  not network products.  There is no communication session

1    over a network.  There is no access configuration or control

2    setting that are exchanged.  The products don't have client

3    server architecture, and they can't possibly infringe this

4    patent.

5              But the plaintiff, up until this point, has

6    asserted that each and every one of the products infringes

7    each and every one of the patent claims of all three patents

8    with the exception of one claim that they acknowledge is

9    not infringed.  But other than the one claim that they

10   acknowledge is not infringed, they say that every product

11   infringes every claim of each of the three patents, but

12   they've refused to explain the basis for that belief.

13             Our position has been for months now, if you

14   have a good faith basis to assert that a product infringes

15   a patent claim, then we're entitled to discover the basis

16   for that contention.  And by doing it product by product, it

17   makes it impossible for them to do what they've done, which

18   is they've given us, we've acknowledged, almost 300 pages of

19   information, but most of it relates to Spector 360.  And,

20             As we mentioned in footnote 2 of our letter

21   brief, if you redact the Spector 360 information, if you

22   were to put black over the parts that are screen shots and

23   information for Spector 360, there is very little and in

24   some cases absolutely no information about the other products.

25   There is nothing about eBlaster Mobile.  There is very

1  little about Spector Pro and eBlaster.  So for the majority

2  of the elements of each claim, the redacted charts that we

3  offered to introduce, if the Court wishes to see them, are

4  just black.  There is nothing there.  We don't understand

5  the basis for the claim.  And, quite frankly, we can't

6  discern a good faith basis for the claim.

7          They've dressed these charts up by, in the first

8  three to five pages, they reference each of the products,

9  but then after that, in the remaining pages, there is

10 nothing said about eBlaster Mobile and there is almost

11 nothing said about the others:  Spector Pro, eBlaster and

12 CNE Investigator.

13         So our position is that the plaintiffs are

14 making a very significant damages claim here, and they have

15 accused each and every product that SpectorSoft sells.  And

16 at the very least, we believe they should be required to

17 disclose the basis for those claims.  And we believe that

18 the applicable rules required that but when we heard that

19 they disagreed with that position, we served specific

20 interrogatory requests and they still refused to, separately

21 for each product, give us a claim chart that maps that

22 accused product on the patent claims.

23         THE COURT:  All right.

24         MR. MARTIN:  And whether it's five or --

25         THE COURT:  And what about the timing?  I

1  understand what they propose substantively sounds a little

2  bit different, but in terms of timing, they propose to

3  supplement by April 19th.  What is your position on the

4  timing?

5         MR. MARTIN:  Well, my position on that is we'll

6  give them however much time they need, if that is what they

7  say.  But it's not fair to give us that, you know, when

8  discovery is closed.  That is what they're proposing.

9         We were supposed to get these contentions months

10 ago.  We're just beginning deposition discovery.  Actually,

11 Mr. Squire and Mr. Connor and myself, we're all here in

12 Florida for three days of depositions of SpectorSoft employees.

13 And if they say they need until April 19th, then I think we

14 have to extend the discovery cutoff date to a month after

15 that and push the other dates accordingly because we

16 shouldn't learn the basis for their claims for the first

17 time after discovery had closed.

18        We're not saying that they can never be

19 supplemented based on additional discovery.  We've never

20 said that.  What we're saying is you sued us.  You have

21 accused all five products or six products of infringing

22 every patent claim.  You are asking us to provide responses

23 to discovery and have witnesses appear for deposition,

24 and we'll do that but we shouldn't have to do it with a

25 blindfold on.  That's what effectively is happening here.

1          THE COURT:  All right.  Go on to the issue about

2    their product, please.

3          MR. MARTIN:  Thank you, Your Honor.  So this

4    part, although it receives very little real estate in the

5    briefing as a result of the page limits, this is actually

6    equally important to us.

7          To be more specific than we were in the letter

8    brief, there is one of plaintiffs' products that is relevant

9    to the second part of this motion.  That product is called

10   Pearl Echo Version 4.0.  This is a product that was

11   developed in the early 2000s.  It's no longer on the market,

12   but if you look at the provisional application for the '237

13   patent, the only thing that was filed for that provisional

14   application were some pages and screen shots related to this

15   Pearl Echo 4.0 product.

16         So when we asked whether Pearl Echo 4.0

17   practiced the claims of each of the three patents, they said

18   it may or may not practice one or more of the claims of each

19   of the three patents.  And,

20         Based on the provisional, I guess we assumed

21   that they would at least acknowledge that it practiced the

22   claims of the '237 patent, but the other two patents are

23   based on a provisional application that made no mention of

24   Pearl Echo 4.0.  Those other two patents relate to a

25   provisional application where they disclose screen shots and

1    source code for Chat 911.

2            Chat 911, you may recall from the claim

3    construction hearing, is a product that was never introduced

4    to the market but it included functionality for real-time

5    monitoring of Internet sessions.  This is the functionality

6    where a kid could be at a computer and there is a predator

7    and he clicks on a button and you have the real-time

8    monitoring.

9            That is what they used as their initial support

10   for the '304 and '571 patents.  And we've asked them whether

11   or not Pearl Echo 4.0 is covered by either of those patents

12   and, if so, to identify the claim as well as whether Pearl

13   Echo 4.0 is covered by the '237 patent.

14           So why does this matter?  Well, it matters for a

15   number of reasons, but among other things, the plaintiffs

16   developed software in 1999 called Cyber Snoop Enterprise

17   3.0.  Cyber Snoop Enterprise 3.0 is prior art.  The

18   plaintiffs admit that it is prior art.

19           Significantly, Cyber Snoop Enterprise 3.0 is

20   very, very similar to Peal Echo 4.0.  In fact, Pearl Echo

21   4.0 was originally called Cyber Snoop Enterprise 4.0.  In

22   other words, Pearl Echo 4.0 is the new version of Cyber

23   Snoop Enterprise.  There was no Pearl Echo 1.0 or 2.0 or

24   3.0.  The first product that was introduced to the market as

25   Pearl Echo was originally to be named Cyber Snoop Enterprise

1   4.0 but then they changed the name to Pearl Echo 4.0 because

2   for marketing reasons, they realized Cyber Snoop had some

3   negative connotations.

4          But the point is that Cyber Snoop Enterprise 3.0

5   is prior art that was not disclosed to the PTO, and the

6   software is very similar to Pearl Echo 4.0.  Plaintiffs'

7   position is that Cyber Snoop Enterprise 3.0 does not fall

8   within the scope of the patent claims.  Of course that is

9   their position because if it did, those claims would be

10  invalid.

11         If they contend that Pearl Echo 4.0 falls within

12  the scope of the patent claim, we're entitled to know that.

13  And if they contend it doesn't fall within the scope of a

14  patent claim, we're entitled to know that, too.  We just

15  need to know their position.

16         The Supreme Court cases from long ago say patent

17  claims are not a nose of wax.  A patent owner can't say one

18  thing to obtain a patent or prove infringement and then turn

19  around and say something different to avoid invalidity.

20         And so we just need to know their position.

21  We're talking about charting one product here:  Pearl Echo

22  4.0.  Plaintiffs filed this case.  They're seeking a

23  significant amount of monetary damages.  They're seeking

24  permanent injunctive relief, they're claiming SpectorSoft

25  infringes all three patents.  And, quite frankly, the

1    plaintiffs should know whether or not their own patents

2    cover their own product.  And all we're asking here is to

3    discover plaintiffs' position with respect to whether 4.0,

4    Pearl Echo 4.0 practices each of the asserted claims.

5           By the way, plaintiffs picked up subsequently

6    released new versions of Pearl Echo after Version 4.0 and if

7    their position with respect to those products is the same as

8    Pearl Echo 4.0, we would agree that there is no need that

9    they need to chart those products separately.  If they have

10   a position on Pearl Echo 4.0 and they say the same applies

11   to Pearl Echo 5.0 or later versions, we don't need to see

12   charts for those later versions.

13          Now, if their position is different for later

14   versions, then we should be entitled to know that, too, but

15   we're not trying to put them through a burden or make work

16   here.  If 4.0 is charted and those charts would apply

17   equally with respect to whether or not the later versions

18   practice each of the patent claims, that would be fine with

19   us to get just the charts for Pearl Echo 4.0.

20          THE COURT:  All right.  Thank you.  Let me hear

21   from the plaintiffs, please.

22          MS. KRAMAN:  Thank you, Your Honor.  This is

23   Pilar Kraman on behalf of plaintiff.

24          The issue with our infringement contentions I

25   guess is three things.  First of all, we contend that their

1      arguments with our charts are really form over substance.  We

2      have not asked them to just figure out what our contentions

3      are.  We do provide nuances in our chart where we feel, where

4      our knowledge was that the products differ, but we do provide

5      substantial contentions in our chart about the accused

6      products as a group and also regarding different components,

7      SpectorSoft components that apply across the product, like

8      their client software and server software.  Our understanding

9      of some of the differences and the facts about the products

10     are a little different than what Mr. Martin said today, and

11     discovery will sort that out.

12             Our expert began review of the source code last

13     week.  That is continuing.  As Mr. Martin said, some of the

14     depositions of SpectorSoft are happening this week.  Yet

15     these 30(b)(6) depositions won't be happening until likely

16     April.  All of those things are underway.

17             We provided a significant amount of detail about

18     what infringes and how.  We haven't heard any complaints

19     regarding our contentions that the specific contentions

20     themselves are wrong or even incomplete, and SpectorSoft

21     never even mentioned the fact that we do provide contentions

22     related to the products as a group or citing to SpectorSoft

23     components that are common across the product.

24             So we think that the busy work of converting

25     three claim charts that are patent by patent, which is a

1    very common way to provide claim charts, to convert those

2    into 18 claim charts is unduly burdensome and unnecessary

3    under the rules or the law in this District.

4            THE COURT:  Well, let me just stop you there

5    because I understand you think it's make work, but defendant

6    insists that if you really break things down, you are going

7    to see that there are plenty of holes and deficiencies for

8    some of the products in what you have charted.

9            How much of a burden would it be?  It seems to

10   me you have already done the work, and why not just have you

11   all literally on the same page and you will all be able to

12   see whether there are holes or not?

13           MS. KRAMAN:  Well, like I mentioned, the

14   contentions themselves contain contentions as to the accused

15   products as a group.  One thing that I want to make clear,

16   too, is that when we served our contentions on December 18th,

17   we didn't have -- we had about 8,000 pages of core technical

18   documents that the defendants produced.  They produced, I

19   noted in the letter, 250,000 pages, but of that, they produced

20   documents natively.  They actually produced 250,000 documents

21   on the 19th and 20th and we're going through that.

22           They asked us, when they initially raised this,

23   they asked us to cut and paste.  In our view, meaningful

24   supplementation would be more worthy of the time it would

25   take to do that.  And we definitely intend to supplement.

1          As we noted in our letter, as the source code

2     review is underway now and the depositions are going forward,

3     those are certainly going to inform our contentions, and if it

4     is the case that we see that there is holes, we'll see that.

5     But as of right now, that is not our understanding of how

6     the products function, and that the different features and

7     functionality that SpectorSoft mentions, that may not matter

8     in terms of infringement.  They could still infringe much

9     in the same way despite having different features and

10    functionality.

11          THE COURT:  All right.  And you say you want

12    until April 19th to do whatever supplementation is ordered.

13    Shouldn't we go ahead, if we agree to that, and extend fact

14    discovery then?

15          MS. KRAMAN:  The parties are actually meeting

16    and conferring on that right now and actually agreeing to

17    extend fact discovery until April 19th because deposition

18    scheduling needs to accommodate schedules.  Some depositions

19    need to occur in April.  So the parties are working on that

20    now anyway, talking about extending.

21          Looking at the schedule, the schedule is somewhat

22    tight to still have our trial go forward.  The schedule looks

23    like there is enough wiggle room that we could extend it three

24    weeks, and that is what the parties are working on.

25          THE COURT:  What about an opportunity for

1    defendants to take discovery after you served your

2    supplemental infringement charts?

3              MS. KRAMAN:  It's not clear to us what discovery

4    that they would be able to take.  They have designated --

5    virtually all of their production is highly confidential, so

6    no witnesses of plaintiff have been able to see anything.

7    And since contention depositions generally aren't prohibited

8    in this District, we're not sure what supplemental discovery

9    they would take.

10             MR. MARTIN:  Your Honor, may I respond to that

11   briefly?

12             THE COURT:  You will get a chance at the end.

13             MR. MARTIN:  Thank you.

14             THE COURT:  All right.  Ms. Kraman, address the

15   request that you chart your own products that you contend

16   practice your patents.

17             MS. KRAMAN:  Well, the interrogatory that

18   SpectorSoft served is virtually identical to the interrogatory

19   that was served in *Leader v Facebook*.  It doesn't ask -- what

20   Mr. Martin said today is not what the interrogatory asked.

21   The interrogatory asks us to provide our contention or it asks

22   us to chart -- I'll give you the exact language.

23             They ask us to serve a chart showing how our

24   products practice the elements of the patent in suit.  That

25   is the question that they're asking which is identical to

1  the interrogatory in *Leader v Facebook*.  And, in our

2  opinion, they haven't sufficiently identified the relevance

3  of asking us to do that.  And that aside, we have provided

4  them sufficient discovery on their request.

5           They asked a similar interrogatory.

6  Interrogatory No. 2 asked us to identify the products.  We

7  gave them those products.  We gave them detailed information

8  about the products in response to Interrogatories 2 and 3.

9  We also produced source code and we produced the executables

10  to the defendant for all of our products.

11           THE COURT:  Have you --

12           MS. KRAMAN:  In addition --

13           THE COURT:  Have you advised them which products

14  of yours practice which claims of which patents?

15           MS. KRAMAN:  We haven't specified the specific

16  claims in response to that interrogatory, but SpectorSoft

17  deposed two of our witnesses last week.  One was an

18  inventor, one of the inventors, who was not a 30(b)(6)

19  witness but they deposed him at length on this issue.  They

20  went claim by claim through each of the patents, asking

21  questions about our products.

22           They also deposed our 30(b)(6) witness for nearly

23  16 hours asking the same question.  And at that point, even

24  though we had produced the source code, they never looked at

25  it.

1          THE COURT:  But don't you at some point, if you

2    are going to continue to take the position that you have

3    products that practice your patent, you are going to have to

4    tell us which products practice which patent claims, aren't

5    you?

6          MS. KRAMAN:  Well, I agree.  And I think that

7    that they got that, what they were looking for through the

8    deposition testimony last week ad nauseam.  I mean literally

9    one of our deponents, he testified for over 16 hours last

10   week.  They asked question after question regarding every

11   claim in our products.

12         THE COURT:  All right.  So why shouldn't I make

13   you at least put in an interrogatory?  It is that I guess

14   you think you substantively disclosed but put it in a

15   response to an interrogatory so we all know going forward

16   this is the position of the plaintiffs with respect to which

17   products we have that practice which patent claims.

18         MS. KRAMAN:  We can do that, but we don't think

19   that producing claim charts would be appropriate.  We think

20   that would be unduly burdensome.  That is essentially what

21   SpectorSoft is asking for, our claim charts.

22         THE COURT:  You are seeking injunctive relief;

23   correct?

24         MS. KRAMAN:  Correct.

25         THE COURT:  Was there anything else you wanted

1    to address?

2              MS. KRAMAN:  One point that I wanted to make,

3    just a quick point, is regarding their claim of prejudice

4    based on our infringement contention, and in our proposal we

5    also proposed giving SpectorSoft time after the close of

6    fact discovery to serve noninfringement contentions which

7    they haven't served to us in the first instance.  So I think

8    their claims of prejudice are somewhat disingenuous because

9    they don't complain at all for the most part about our claim

10   chart for the '571 patent, yet we've gotten no noninfringement

11   contentions on those.  They seem to agree our contentions

12   are sufficient for SpectorSoft 360 for all patents and they

13   haven't provided noninfringement contentions for those.  So

14   our proposal would give them, you know, to make contentions

15   which is after the close of fact discovery but before opening

16   expert reports are due to serve their noninfringement

17   contentions.

18              THE COURT:  Okay.  Thank you very much.

19              Mr. Martin, you can respond.

20              MR. MARTIN:  Thank you, Your Honor.  There

21   were a number of different things that factually I would

22   vehemently disagree with, but I think it's probably more

23   productive to focus instead on what I guess we're asking for

24   with specificity.  And if the Court would like me to respond

25   to any of those factual statements that have been made, I'd

1   be happy to do so.  I can spend 15 minutes on it now but I'm

2   not sure that's the productive way to spend our time.

3           With respect to the first part of the motion,

4   we would like to have a date certain, April 19th would be

5   fine, by which we get the claim charts.  The form of those

6   claim charts should be each product individually.  Those

7   claim charts should reference the documents that they're

8   citing to.

9           Here, although they acknowledge that they had

10  8,000 pages of documents when they provided their initial

11  chart and have 250,000 documents or pages now, those charts

12  don't reference a single document that was produced in

13  discovery.  Not one.  They only reference the things that they

14  pulled from the publicly available website and presumably

15  those documents were available -- well, they were available

16  prior to filing suit and presumably that's the basis for the

17  claims.

18          So in these charts, they should reference the

19  documents that they're including.  We shouldn't have to play

20  this game of hide and seek to try to understand what they're

21  claiming.  The initial schedule provided for claim charts in

22  December.  Actually, earlier than that.  We extended the

23  date until December.  And the initial discovery cutoff date

24  was the end of March.

25          It's fundamentally unfair for to require us to

1    put up 30(b)(6) witnesses or other witnesses in discovery

2    without knowing even the basis for their claims, not even

3    the most basic information about how they contend certain

4    products infringe.  And we're supposed to put a witness up

5    as the person most knowledgeable on noninfringement?  Well,

6    it's really difficult to do that and it feels like they're

7    hiding the ball here.

8            The expert reports are a really significant

9    issue.  We shouldn't have to have our expert wait until

10   April 19th and then have to produce a report, scrambling

11   at the last minute because we had no idea what their

12   infringement claims are.  We need to have adequate time

13   after receiving those to review them and analyze them,

14   consider their claims.  Maybe they have a good faith basis

15   that we just can't conceive of, but we need time to

16   understand them, respond to them, and then prepare expert

17   reports based on them.

18           Obviously, the position that the plaintiffs take

19   for infringement should be consistent with the construction

20   of the claims for purposes of invalidity.  So our invalidity

21   contention depends on understanding how they're alleging

22   infringement.  And I recognize that Your Honor hasn't seen the

23   facts here yet but it's going to be really, really hard for

24   the plaintiffs to allege that SpectorSoft's products infringe

25   and somehow say that Cyber Snoop Enterprise 3.0 does not,

1    because if you apply a standard to SpectorSoft's product and

2    you apply the same standard to Cyber Snoop Enterprise 3.0, you

3    are going to see the position the plaintiffs are taking is

4    necessarily inconsistent.  If we infringe, their patent is

5    invalid.  We don't think we infringe.

6              So I guess April 19th is fine but we have to set

7    a fact discovery cutoff date that gives us time to put up

8    witnesses after that date who are prepared for deposition

9    and to have experts receive those contentions and prepare

10   our reports.  I'm not necessarily saying that we need as

11   much time as was originally provided, but we need a couple

12   months.  Otherwise, we're fighting with one hand tied behind

13   our back.

14             With respect to the second part of the motion, I

15   would agree, as I said earlier, that if the plaintiffs tell

16   us which products practice each claim of each patent, that

17   probably is sufficient provided that they chart Pearl Echo

18   4.0.  I recognize that the initial interrogatory was worded

19   more broadly and they were willing to meet and confer, but

20   to simply say that one or more products may or may not

21   practice one or more claims of each of the three patents is

22   not sufficient.

23             And with respect to Pearl Echo 4.0, we're really

24   entitled to understand whether or not they say that that

25   product practices each claim of each patent.  If they say it

1    doesn't, maybe they shouldn't have to chart it.  That's

2    fine.  But if they say that it does, if they say that, for

3    example, that product practices the '571, the real-time

4    patent, which I can't even understand how they could take

5    that position, I'd like to understand how they take that

6    position because that is the same reason I can't understand

7    how they can allege that we infringe.  There is nothing even

8    close to real-time, but they say we infringe.  And if we

9    infringe, then Pearl Echo 4.0 probably practices that patent

10    claim under the same explanation, and we're entitled to

11    understand that if that is their position.

12           Maybe they say there are differences.  I can't

13    read their minds.  But clearly they have experts that have

14    been working on their side, and they're aware of these

15    issues just as we are, and they know their position and

16    unfortunately we don't.

17           THE COURT:  What about your noninfringement

18    contentions?

19           MR. MARTIN:  We're happy to provide

20    non-infringement contentions.  We've never taken a position

21    that we wouldn't.  As I said earlier, I think that we should

22    see their infringement contentions first so we can respond

23    to them.

24           THE COURT:  Are you willing to provide the same

25    level of detail in your charts that you are asking me to

1   order them to do in their supplemental infringement chart?

2          MR. MARTIN:  Absolutely.  I think it's going to

3   make everything in this case after that point be more

4   efficient, including summary judgment.

5          THE COURT:  And how much time do you need after

6   you get their supplemental infringement charts?

7          MR. MARTIN:  Well, I haven't looked at what the

8   original schedule provided, but six weeks seems like that

9   would be enough time.

10          THE COURT:  All right.  Is there anything else

11   you wanted to add, Mr. Martin?

12          MR. MARTIN:  No, other than to say we don't, for

13   a minute, believe that the charts that have been provided

14   are sufficient for 360 or any other product, but they are

15   what they are.  They provided 300 pages, and if that is

16   their contentions, we'll accept them.  We're just trying to

17   get their basic position.  Whether or not we agree with it

18   is a different issue.

19          THE COURT:  All right.  Well, you are going to

20   get more.  Let me give you my rulings here.

21          First, with respect to the request for the

22   plaintiffs to serve supplemental infringement charts, I'm

23   granting that request.  I largely agree with the argument

24   made by the defendant here, so the supplemental infringement

25   charts have to be meaningful supplementation.

1          In the context of this case, that shall include

2     a separate chart for each product that the plaintiffs are

3     accusing of infringement for each patent.  So I recognize

4     that may mean 15 or 18 charts, I'm not quite sure of the

5     math there, but I don't think it is just make work.  I think

6     it is an exercise that at some conceptual level both sides

7     need to go through in any event.  While it will be quite a

8     lot of pages, it will allow both sides to know exactly what

9     is being contended by the plaintiffs and perhaps may reveal

10    some holes in the whole infringement case with respect to

11    some of the patents and some of the products.  We will see.

12         But in any event, defendant is entitled to

13    know with particularity what the plaintiffs' infringement

14    contentions are, and there need be reference to specific

15    documents as well.  We have, and will have, reached the time

16    in this case where that is appropriate under the circumstances

17    here.

18         The defendant doesn't oppose the plaintiffs'

19    proposed date of April 19th so this supplementation I order

20    to be done by April 19th.

21         In terms of the second part of the request, I'm

22    largely granting the relief sought by the defendant there

23    as well.  Specifically, the plaintiffs need to supplement

24    their response to the interrogatory to advise the defendant

25    specifically of which products the plaintiffs sell or have

1    sold that they contend practice any of the claims of any of

2    the patents, and they need to identify specifically which

3    claims of which patents for which products.  And,

4              On top of that, I am going to go ahead and do

5    hereby order that the plaintiffs also provide a chart with

6    respect to the Pearl Echo 4.0 product, provide a chart for

7    any of the claims of any of the patents that the plaintiffs

8    contend the Pearl Echo 4.0 product practices.  Under the

9    circumstances here, including the arguable relationship

10   between the Pearl Echo 4.0 product and what is agreed to

11   be prior art and also, of course, given the plaintiffs'

12   request for injunctive relief, I believe in this case it is

13   appropriate for the plaintiff to have to do this.

14             I understand there was a ruling in my *Leader v*

15   *Facebook* case that some may think is in some tension with

16   today's ruling.  On that, I'll say, first, of course, that

17   was a different case but, second, I believe in that case

18   the plaintiffs had already at least provided a lot of the

19   information that I'm ordering the plaintiffs here to give

20   specifically linking the product, their own product to

21   specific claims of their own patents.  But be that as it may

22   be, under the circumstances here, you have my ruling in this

23   case.

24             I am also going to order and do hereby order

25   that the defendant serve its very meaningful noninfringement

1    contentions by the date the plaintiffs have proposed which is

2    May 10th.  Those contentions by the defendant shall be at the

3    same level of detail that I have ordered for the plaintiffs'

4    supplemental infringement contentions, including, of course,

5    specific references to documents that have been produced in

6    discovery to that point.

7              I understand the parties are talking about

8    additional time for fact discovery.  We'll see where that

9    leads.  My guess is if you are all agreeable to some

10   extensions, I will probably agree to it as well.

11             To the extent the defendants are asking me to

12   extend fact discovery for them in light of my other rulings

13   today, that request is denied without prejudice to the

14   defendant's ability to return if they think that your

15   meeting and conferring does not give you the additional

16   discovery that you think you are entitled to, including

17   discovery after the service of the supplemental infringement

18   contentions.

19             I don't have time for more argument but I want

20   to make sure I am clear in what I have ruled.  Are there any

21   questions, Mr. Martin?

22             MR. MARTIN:  No, Your Honor.  I think I

23   understand that.  Thank you very much.

24             THE COURT:  Okay.  Ms. Kraman, are there any

25   questions?

1          MS. KRAMAN:  No.  Thank you, Your Honor.

2          THE COURT:  Thank you all very much.

3          MR. SQUIRE:  Your Honor, I'm sorry.  This is

4   Monte Squire.  I want to get one other thing to the record

5   and I will be very brief.

6          There was mention of agreed upon prior art that

7   was represented by the other side.  There is no agreement

8   about what is or what is not prior art.

9          THE COURT:  Okay.  I appreciate you noting that,

10  and you are right.  I hadn't actually gotten your position

11  on that, but it doesn't affect my ruling.  I understand the

12  argument that the Cyber Snoop 3.0 is prior art.  If it's not

13  agreed upon, it's not agreed upon, but I still have the same

14  ruling.  I appreciate you noting that.

15         Is there anything else, Mr. Squire?

16         MR. SQUIRE:  No.  Thank you, Your Honor.

17         THE COURT:  Thank you all very much.  Good-bye.

18         (Telephone conference ends at 11:27 a.m.)

19

20      I hereby certify the foregoing is a true and accurate
    transcript from my stenographic notes in the proceeding.

21

22                        /s/ Brian P. Gaffigan
                        Official Court Reporter
23                        U.S. District Court

24

25