IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

HELIOS SOFTWARE, LLC and PEARL                :
SOFTWARE, INC.,                               :
                                              :
                    Plaintiffs,               :
                                              :
            v.                                :   C.A. No. 12-081-LPS
                                              :
SPECTORSOFT CORPORATION,                      :
                                              :
                    Defendant.                :

Adam W. Poff, Esq., Monté T. Squire, Esq., Pilar G. Kraman, Robert M. Vrana, YOUNG,
CONAWAY, STARGATT & TAYLOR LLP, Wilmington, DE.

Cabrach J. Connor, Jeffrey R. Johnson, REED & SCARDINO LLP, Austin, TX.

    Attorneys for Plaintiffs.

Rex A. Donnelly, RATNER PRESTIA, Wilmington, DE.

James P. Martin, SHARTSIS FRIESE LLP, San Francisco, CA.

    Attorneys for Defendant Spectorsoft Corporation.

MEMORANDUM OPINION

UNSEALED ON
SEPTEMBER 25, 2014

September 18, 2014
Wilmington, Delaware

*[signature]*

**STARK, U.S. District Judge:**

Pending before the Court are the following motions:

1.      Plaintiffs' Motion to Exclude Certain Opinions of SpectorSoft's Expert Geoff A. Cohen, Ph.D. (D.I. 332);

2.      Defendant SpectorSoft Corporation's *Daubert* Motion to Exclude Opinions and the Proposed Expert Testimony of Scott Weingust on Damages (D.I. 340)

3.      SpectorSoft Corporation's Motion for Partial Summary Judgment of Non-Infringement of the '237 Patent (D.I. 329);

4.      SpectorSoft Corporation's Motion for Partial Summary Judgment of Non-Infringement of the '571 Patent (D.I. 330);

5.      SpectorSoft Corporation's Motion for Partial Summary Judgment of Non-Infringement of the '304 Patent (D.I. 331);

6.      SpectorSoft Corporation's Motion for Partial Summary Judgment of Non-Infringement by Spector PRO, eBlaster, and eBlaster Mobile (D.I. 338);

7.      SpectorSoft Corporation's Motion for Partial Summary Judgment of No Willful Infringement (D.I. 339);

8.      SpectorSoft Corporation's Motion for Partial Summary Judgment Regarding Limitations on Damages (D.I. 337);

9.      SpectorSoft Corporation's Motion for Partial Summary Judgment of Invalidity of the '304 Patent (D.I. 334);

10.      SpectorSoft Corporation's Motion for Partial Summary Judgment of Invalidity of the '571 Patent (D.I. 335);

11.     Plaintiffs' Motion for Summary Judgment Regarding Defendant SpectorSoft

Corporation's Second and Third Affirmative Defenses for Prosecution History Estoppel, Lack of

Patentable Subject Matter Under 35 U.S.C. § 101, and Lack of Written Description, Non-

Enablement, and Indefiniteness Under 35 U.S.C. § 112 (D.I. 341); and

12.     Plaintiffs' Motion for Leave to Amend the Complaint (D.I. 442).

## I.     BACKGROUND

On January 26, 2012, Plaintiffs Helios Software, LLC ("Helios") and Pearl Software, Inc.

("Pearl") (collectively, "Plaintiffs") filed a complaint against Defendant SpectorSoft Corporation

("SpectorSoft" or "Defendant") alleging infringement of U.S. Patent Nos. 6,978,304 (the "'304

Patent") and 7,634,571 (the "'571 Patent"). (D.I. 1) On March 22, 2012, Plaintiffs filed an

amended complaint adding allegations of infringement of U.S. Patent No. 7,958,237 (the "'237

Patent"). (D.I. 9)

Fact and expert discovery are complete, but no trial date has been set. The Court heard

oral argument on the pending motions on July 22, 2014. (D.I. 445) ("Tr.")

## II.     LEGAL STANDARDS

### A.     *Daubert* Motions to Exclude

In *Daubert v. Merrell Dow Pharm., Inc.*, 509 U.S. 579, 597 (1993), the Supreme Court

explained that Federal Rule of Evidence 702 creates "a gatekeeping role for the [trial] judge" in

order to "ensur[e] that an expert's testimony both rests on a reliable foundation and is relevant to

the task at hand." Rule 702 requires that expert testimony "help the trier of fact to understand the

evidence or to determine a fact in issue." Expert testimony is admissible only if "the testimony is

based on sufficient facts or data," "the testimony is the product of reliable principles and

2

methods," and "the expert has reliably applied the principles and methods to the facts of the case."

There are three distinct requirements for proper expert testimony: (1) the expert must be qualified; (2) the opinion must be reliable; and (3) the expert's opinion must relate to the facts. *See Elcock v. Kmart Corp.*, 233 F.3d 734, 741 (3d Cir. 2000).

## B. Summary Judgment

Pursuant to Rule 56(a) of the Federal Rules of Civil Procedure, "[t]he court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." The moving party bears the burden of demonstrating the absence of a genuine issue of material fact. *See Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 585-86 (1986). An assertion that a fact cannot be – or, alternatively, is – genuinely disputed must be supported either by citing to "particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations (including those made for purposes of the motion only), admissions, interrogatory answers, or other materials," or by "showing that the materials cited do not establish the absence or presence of a genuine dispute, or that an adverse party cannot produce admissible evidence to support the fact." Fed. R. Civ. P. 56(c)(1)(A) & (B). If the moving party has carried its burden, the nonmovant must then "come forward with specific facts showing that there is a genuine issue for trial." *Matsushita*, 475 U.S. at 587 (internal quotation marks omitted). The Court will "draw all reasonable inferences in favor of the nonmoving party, and it may not make credibility determinations or weigh the evidence." *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 150 (2000).

3

To defeat a motion for summary judgment, the nonmoving party must "do more than simply show that there is some metaphysical doubt as to the material facts." *Matsushita*, 475 U.S. at 586; *see also Podobnik v. U.S. Postal Serv.*, 409 F.3d 584, 594 (3d Cir. 2005) (stating party opposing summary judgment "must present more than just bare assertions, conclusory allegations or suspicions to show the existence of a genuine issue") (internal quotation marks omitted). However, the "mere existence of some alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment;" a factual dispute is genuine only where "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247-48 (1986). "If the evidence is merely colorable, or is not significantly probative, summary judgment may be granted." *Id.* at 249-50 (internal citations omitted); *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986) (stating entry of summary judgment is mandated "against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial"). Thus, the "mere existence of a scintilla of evidence" in support of the nonmoving party's position is insufficient to defeat a motion for summary judgment; there must be "evidence on which the jury could reasonably find" for the nonmoving party. *Anderson*, 477 U.S. at 252.

## III.    DISCUSSION

### A.    Plaintiffs' Motion to Exclude Certain Opinions of SpectorSoft's Expert Geoff A. Cohen, Ph.D. (D.I. 332)

Plaintiffs ask the Court to exclude certain opinions of SpectorSoft's validity expert, Dr. Geoff A. Cohen, because: (1) Dr. Cohen's experimental testing analysis appeared for the first

4

time in his Reply Report; (2) Dr. Cohen did not produce all test data files, rendering his experimental testing analysis unreliable; (3) Dr. Cohen incorrectly applies the legal standard for inherency; and (4) Dr. Cohen set forth an obviousness theory in his Reply Report based upon one combination of the Freund '611 patent and Pearl's Cyber Snoop software but indicated during his deposition that he intended to testify at trial on any of sixteen different combinations of these two references.

In his Opening Report, Dr. Cohen opined that ODSE, LapLink, the Freund Patent, and Pearl's Cyber Snoop software all rendered the asserted claims invalid for lack of novelty and/or nonobviousness. Dr. Cohen did not disclose a network capture analysis in his Opening Report. (*See* D.I. 326-2 IA00751 at 66:14-16)

Dr. Scott Nettles, Plaintiffs' validity expert, in his Rebuttal Report criticized various portions of Dr. Cohen's Opening Report for not providing evidence of actually testing the products. Subsequently, for his Reply Report, Dr. Cohen performed testing and presented his testing data to respond to Dr. Nettles' criticisms. Plaintiffs argue that "Dr. Cohen could have performed [this] testing analysis before serving his opening report" and, because he failed to do so, his testimony regarding the testing data should be excluded. (D.I. 395 at 3)

Evidence disclosed in an expert report is proper "if the evidence is intended solely to contradict or rebut evidence on the same subject matter identified by another party." Fed. R. Civ. P. 26(a)(2)(D)(ii). Rebuttal evidence is properly admissible when it will "explain, repel, counteract or disprove the evidence of the adverse party." *Crowley v. Chait*, 322 F. Supp. 2d 530, 551 (D.N.J. 2004) (citing *United States v. Chrzanowski*, 502 F.2d 573, 576 (3d Cir. 1974)). Reply reports "may cite new evidence and data so long as the new evidence and data is offered to

5

directly contradict or rebut the opposing party's expert." *Withrow v. Spears*, 2013 U.S. Dist. LEXIS 122489, at \*45 (D. Del. Aug. 22, 2013); *see also Crowley*, 322 F. Supp. 2d at 551 (stating that courts need not "automatically exclude anything an expert could have included in his or her original report. Such a rule would lead to the inclusion of vast amounts of arguably irrelevant material in an expert's report on the off chance that failing to include any information in anticipation of a particular criticism would forever bar the expert from later introducing the relevant material. All that is required is for the information to repel other expert testimony . . .").

Plaintiffs seek to exclude Dr. Cohen's testing data because "Dr. Cohen could have performed testing analysis before serving his Opening Report," but he decided not to. (D.I. 395 at 3) In explaining the lack of testing data in his Opening Report, Dr. Cohen testified that he "thought that the disclosures from the documentation were clear and convincing, and I didn't feel like I needed to do [testing]. It's very time intensive, and I was conscious of time and budget. And I didn't think it was necessary to demonstrate the points, you know." (D.I. 326-2 IA00751 at 66:7-24) For example, Dr. Nettles argued that Dr. Cohen had failed to demonstrate that LapLink and ODSE terminated certain sessions. Dr. Cohen testified that these sessions terminated but he did not initially conduct experimentation to show termination of these sessions. (D.I. 322 at IA00352-53 ¶¶ 177-78) But after Dr. Nettles leveled his criticisms, Dr. Cohen performed the testing to support his testimony. This is precisely the type of "evidence [that is] intended solely to contradict or rebut evidence on the same subject matter identified by another party" that Rule 26(a)(2)(D)(ii) permits in rebuttal.

Plaintiffs further contest Dr. Cohen's "new theor[y]" that TCP FIN and RST flags indicate session terminations and initiations, respectively. (D.I. 395 at 3) However, these are not

6

new theories. Dr. Cohen opined in his Opening Report that two connections in the LapLink software were concurrent. Dr. Nettles responded that "[c]oncerning 9b, Dr. Cohen does not provide convincing support that the 'another' Internet session is initiated concurrently. It [is] not enough to just be concurrent [to meet the claim limitation]." (D.I. 336 Ex. C ¶ 84) Dr. Cohen's Reply Report simply supports his position that the second session is initiated concurrently with the first. Because the Court does not find the new testing evidence in Dr. Cohen's Reply Report to be outside the scope of his Opening Report, the Court will deny Plaintiffs' request to exclude.

Next, Plaintiffs ask the Court to strike Dr. Cohen's testimony because he allegedly did not produce all test data files, rendering his experimental testing analysis unreliable. Plaintiffs support their claim primarily by pointing out that the file produced by Dr. Cohen containing his experimental data is labeled "experiment4." Plaintiffs ask the Court to presume that at least files "experiment1," "experiment2," and "experiment3" exist, although no such files have been produced. The Court will not take this speculative leap, as Defendant has explicitly represented that it has produced "all test data that [Dr.] Cohen considered in forming his opinions." (D.I. 374 at 8) At oral argument, Defendant further represented that it had disclosed all data upon which Dr. Cohen relied.[1]

Plaintiffs next assert that Dr. Cohen's opinions should be excluded because he incorrectly applies the legal standard for inherency. Essentially, Plaintiffs argue that Dr. Cohen committed legal error by applying the anticipation-by-inherent-disclosure doctrine to his obviousness

---

[1]However, because there seems to be some disagreement as to what Dr. Cohen "relied on" versus what he "considered," the Court will order SpectorSoft to provide Plaintiffs with all of the network trace data and results from the LapLink and ODSE experiments. Additionally, the Court will also allow Plaintiffs to take depositions of Dr. Cohen's team.

analysis. (*See* D.I. 395 at 5-6) Plaintiffs contend that "[b]asing an obviousness finding on inherency is error; they are distinct concepts." (*Id.* at 5) Contrary to Plaintiffs' argument, inherent disclosure can play a role in an obviousness analysis. *See, e.g., In re Napier*, 55 F.3d 610, 613 (Fed. Cir. 1995) ("The inherent teaching of a prior art reference, a question of fact, arises both in the context of anticipation and obviousness."). The relevant question is whether "the inherency would have been obvious to one skilled in the art." *Eurand, Inc. v. Mylan Pharm., Inc.*, 263 F.R.D. 136, 141 (D. Del. 2009). Because Dr. Cohen's testimony relates to whether the inherent disclosure would have been obvious to one skilled in the art, his analysis is not unreliable.

Plaintiffs also assert that Dr. Cohen's testimony is unreliable because he misapplies the facts in his obviousness analysis. (D.I. 395 at 7) According to Plaintiffs, Dr. Cohen relies on inherency to show how the client requests and receives an access configuration. Dr. Cohen testified that "[i]nherently, the client must receive the second network address of the ISP supervisor server from another server at a first network address, such as a DNS server, Active Directory Server, or other similar technologies." (D.I. 397-7 Ex. G at 3) During his deposition, Dr. Cohen testified that:

> A.  The ISP disclosure for – the system is described for the ISP supervisor to work, there must be a mechanism. This is how they worked at the time. You have a mechanism where you receive the address. DNS is disclosed. There has to be something. There has to be something. Inherently there is something. The address doesn't appear magically on the computer.
>
> Q.  So in your opinion, it's – there's necessarily some mechanism that provides a way for the client here to

> go and retrieve the ISP supervisor address; is that correct?

A.     Yes. There has to be some mechanism to do that.

(D.I. 326-20, IA00792 at 231:4-18) Plaintiffs argue that Dr. Cohen's testimony should be excluded because "he provides no analysis or reasoning to support his opinion that the address is provided to the client in the way the claim requires." (D.I. 395 at 8-9) However, just because there is a purported dearth of analysis in Dr. Cohen's testimony does not mean that "the testimony is based on [in]sufficient facts or data" or that "the testimony is the product of [un]reliable principles and methods." Fed. R. Evid. 702. Plaintiffs' argument relates to the testimony's weight, not its admissibility.

Finally, Plaintiffs argue that the CyberSnoop Enterprise ("CSE")/Freund combinations that Dr. Cohen disclosed for the first time in his Reply Report should be stricken. Dr. Cohen disclosed one combination of CSE and Freund in his Opening Report that he alleges renders the '237 Patent obvious. When Dr. Nettles challenged this one combination, Dr. Cohen stated in his Reply Report that several of the patent's claim limitations are present in both prior art references and there are several ways in which these two references can be combined to meet the claim limitations of the asserted claims. These combinations described in the Reply Report are not "new obviousness theories." The obviousness theory is that CSE and Freund, in combination, render the asserted claims of the '237 Patent obvious. In his Opening Report, Dr. Cohen cited one example of how these two references could be combined to meet all of the claim limitations. That there is more than one way to combine the two references to meet all of the claim limitations is not a new theory; it is simply an explanation of the original non-obviousness

9

theory.

For the foregoing reasons, Plaintiffs' motion to exclude certain opinions of SpectorSoft's expert Geoff A. Cohen, Ph. D. is denied.

## B. SpectorSoft Corporation's Motion to Exclude Opinions and the Proposed Expert Testimony of Scott Weingust on Damages (D.I. 339)

SpectorSoft argues that the expert testimony of Plaintiffs' damages expert, Scott Weingust, should be excluded because he failed to meet the standards for reasonable royalty opinions. According to SpectorSoft, Mr. Weingust's testimony should be excluded for three reasons. First, Mr. Weingust allegedly failed to satisfy the Entire Market Value rule and improperly relied on unapportioned revenues anyway. Second, he improperly assumed that the relevant submarket includes only Pearl and the two accused infringers. Third, SpectorSoft alleges that Mr. Weingust's hypothetical royalty rates are unsupported by calculations or factual analysis. Plaintiffs disagree with each of SpectorSoft's arguments specifically and further contend that each of the arguments relate to the weight to be accorded Mr. Weingust's testimony, not its admissibility.

Under *Uniloc USA, Inc. v. Microsoft Corp.*, "the patentee . . . ***must in every case*** give evidence tending to separate or apportion the defendant's profits and the patentee's damages between the patented features and the unpatented features . . . or show that the entire market value of the whole machine, as a marketable article, is properly and legally attributable to the patented feature." 632 F.3d 1292, 1318 (Fed. Cir. 2011) (emphasis added). The Federal Circuit has further explained that "[w]here small elements of multi-component products are accused of infringement, calculating a royalty on the entire product carries a considerable risk that the

10

patentee will be improperly compensated for non-infringing components of that product."

*LaserDynamics v. Quanta Comp., Inc.*, 694 F.3d 51, 67 (Fed. Cir. 2012). Generally, royalties

must be based on the "smallest salable patent-practicing unit;" the entire market value rule is an

exception to this general rule. *Id.* However a question arises when the smallest salable unit

comprises both patented and unpatented features. Plaintiffs contend that in this scenario, it is

appropriate to use the entire revenue from sales of this smallest salable unit to calculate the

royalty base. SpectorSoft counters that the general rule requiring apportionment of revenues and

damages applies even when the smallest salable unit comprises both patented and unpatented

features. According to SpectorSoft, the only exception to the requirement that a defendant's

profits and a patentee's damages be apportioned between the patented and unpatented features is

evidence showing that the entire market value of the accused product is properly and legally

attributable to the patented feature. *See Uniloc*, 632 F.3d at 1318.

In *LaserDynamics*, the Federal Circuit discussed its decision in *Lucent Technologies, Inc.*

*v. Gateway, Inc.*, 580 F.3d 1301, 1332 (Fed. Cir. 2009), explaining that in *Lucent*,

> the patent at issue involved a helpful and convenient "date picker"
> feature that was being used within the grand scheme of Microsoft's
> Outlook email software. We held that because the patented feature
> was "but a tiny feature of one part of a much larger software
> program," a royalty could not be properly calculated based on the
> value of the entire Outlook program because "there was no
> evidence that anybody anywhere at any time ever bought Outlook
> ... *because* it had the patented date picker."

*LaserDynamics, Inc.*, 694 F.3d at 68-69 (quoting *Lucent*, 580 F.3d at 1332-33); *see also AVM*

*Technologies, LLC v. Intel Corp.*, 2013 WL 126233, at *2 (D. Del. Jan. 4, 2013) (holding that

"'entire market value rule' can apply to a smallest saleable patent practicing unit when the

smallest saleable patent practicing unit is itself made up of multiple components").

Plaintiffs agree that the accused devices comprise both patented and unpatented features. *(See, e.g.*, D.I. 321-1 at DA 00024 ¶ 60) (Mr. Weingust testifying that "SpectorSoft's recording agent has minimal independent value given that the patents-in-suit are a pre-condition to obtaining the benefits of the recording agent (i.e., the recording agent would not be necessary or valuable if the Accused Products did not also use the patents-in-suit)") Mr. Weingust further agrees that he did not apportion the "defendant's profits and the patentee's damages between the patented features and the unpatented features." *(See id.* at DA 00023 ¶ 57) ("In determining the proper royalty base in this case, I recognize that the smallest saleable unit is equivalent to the entire market value of the Accused Products. As such, I ultimately use the entire market value of the Accused Products to calculate the royalty base.")

Plaintiffs argue that Mr. Weingust's analysis was proper for two reasons. First, they contend that Mr. Weingust properly relied on unapportioned revenue from sales of the accused products because those products are the smallest saleable patent-practicing units. Second, they argue that Mr. Weingust properly relied on unapportioned revenue because he satisfied the entire market value rule.

Because it is uncontested that the accused products comprise both patented and unpatented features, Mr. Weingust needed to apportion profits and damages between the patented and unpatented features of the accused product to render a reliable damages analysis. The only exception to the apportionment requirement is evidence demonstrating that the entire market value of the accused product is properly and legally attributable to the patented feature. *See Uniloc*, 632 F.3d at 1318. In attempting to satisfy the entire market value rule, Mr. Weingust

12

testified that "it is the features covered by the patents-in-suit that created a sub-market for the

Accused Products, Pearl Echo, and certain other competitive product[s] primarily sold by

Awareness, which have also been accused of infringing the patents-in-suit in the Awareness case.

As a result, it follows that it is the features covered by the patents-in-suit that form the basis for

consumer demand for the Accused Products." (D.I. 321-1 at DA00023 ¶ 60) In various parts of

his expert report, Mr. Weingust discusses the importance of the patented features to the accused

products. (*See, e.g., id.* at DA008-11, DA0017-19, DA0023-24) However, Mr. Weingust never

conducted a market analysis or otherwise provided evidence showing that it is the patented

features that drive the demand for the accused products. *See LaserDynamics*, 694 F.3d at 68 ("It

is not enough to merely show that the [patented] method is viewed as valuable, important, or

even essential to the use of the [accused product]. Nor is it enough to show that [the accused

product] without [the patented] method would be commercially unviable."). To satisfy the entire

market value rule, Mr. Weingust needed to provide "a higher degree of proof," that "the presence

of [the patented] functionality is what motivates consumers to buy the [accused product] in the

first place." *Id.*

In light of Mr. Weingust's failure to satisfy either the apportionment requirement or the

entire market value rule in his damages analysis, the Court finds that it must exclude Mr.

Weingust's testimony on damages. Therefore, SpectorSoft's *Daubert* Motion to Exclude

Opinions and the Proposed Expert Testimony of Scott Weingust on Damages is granted.[2]

---

[2]This is in contrast to *NuVasive Inc. v. Globus Medical Inc.*, 10-849-LPS D.I. 234 at 97-
101, in which this Court denied a similar motion to strike a damages expert, as there the record
included some evidence from which it could be found that the patented features drove demand
for the product.

Because no trial date has been set, the Court will allow Plaintiffs to file a supplemental expert damages report to address the deficiencies in Mr. Weingust's analysis. If Plaintiffs decide to file a supplemental report, Plaintiffs shall also make Mr. Weingust available for a short deposition. SpectorSoft may also file a rebuttal damages report addressing Mr. Weingust's new report.

## C. SpectorSoft Corporation's Motion for Partial Summary Judgment of Non-Infringement of the '237 Patent (D.I. 329)

By way of its motion, SpectorSoft argues that Plaintiffs cannot prove that SpectorSoft infringes the '237 Patent because prosecution history estoppel presumptively bars Plaintiffs from claiming that SpectorSoft infringes through the doctrine of equivalents and Plaintiffs cannot rebut that presumption. Plaintiffs respond that they are not estopped because the patent applicants did not amend the claims to overcome a PTO rejection and, further, even if the presumption of prosecution history estoppel does apply, Plaintiffs overcome the presumption because the amendment was tangential to the proposed equivalent.

To literally infringe a patent claim, an accused product or method must contain "each limitation of the claim" and "any deviation from the claim precludes such a finding." *Telemac Cellular Corp. v. Topp Telecom, Inc.*, 247 F.3d 1316, 1330 (Fed. Cir. 2001). Where an independent claim is not infringed, any claims depending from that claim are also not infringed. *See Wolverine World Wide v. Nike, Inc.*, 38 F.3d 1192, 1199 (Fed. Cir. 1994).

When every limitation is not literally present, a patentee may argue direct infringement under the doctrine of equivalents, which requires proof that all of the elements of the claim are present in the accused process either literally or by equivalent. *See Warner-Jenkinson Co. v. Hilton Davis Chem. Co.*, 520 U.S. 17, 21, 24, 29, 40 (1997). The doctrine of equivalents is

14

applied to individual limitations, not to the invention as a whole. Whether the doctrine of equivalents may be applied is a question of law. *See Festo Corp. v. Shoketsu Kinzoku Kogyo Kab. Co.*, 344 F.3d 1359, 1367 (Fed. Cir. 2003) ("*Festo IX*").

Prosecution history estoppel limits the doctrine of equivalents. *See Glaxo Wellcome, Inc. v. Impax Labs., Inc.*, 356 F.3d 1348, 1351 (Fed. Cir. 2004). There is a presumption that a narrowing amendment made for a reason of patentability surrenders the entire territory between the original claim limitation and the amended claim limitation. *See Festo IX*, 344 F.3d at 1365; *Cross Med. Prods. v. Medtronic Sofamar Danek, Inc.*, 480 F.3d 1335, 1341 (Fed. Cir. 2003). To rebut this presumption, "the patentee must demonstrate that the alleged equivalent would have been unforeseeable at the time of the narrowing amendment, that the rationale underlying the narrowing amendment bore no more than a tangential relation to the equivalent in question, or that there was some other reason suggesting that the patentee could not reasonably have been expected to have described the alleged equivalent." *Festo IX*, 344 F.3d at 1368. "Issues of prosecution history estoppel are resolved as a matter of law." *Funai Elec. Co., Ltd. v. Daewoo Electronics Corp.*, 616 F.3d 1357, 1368 (Fed. Cir. 2010)

"In determining whether an estoppel arose, and the scope of the estoppel, the analysis focuses on the claims as originally filed, the amendments made, and the reasons therefor." *Id*. An amendment cannot reasonably be viewed as surrendering a particular equivalent if the rationale underlying the amendment bears no more than a tangential relation to the equivalent. *See Festo. Corp. v. Shoketsu Kinzoku Kogyo Kabushiki Co.*, 535 U.S. 722, 740-41 (2002) ("*Festo*"). However, "[t]he tangential relation criterion for overcoming the *Festo* presumption is very narrow." *Honeywell Int'l, Inc. v. Hamilton Sundstrand Corp.*, 523 F.3d 1304, 1315 (Fed.

15

Cir. 2008) ("*Honeywell II*"). "To rebut the estoppel presumption with tangentiality, a patentee must demonstrate that the rationale underlying the amendment bore no more than a tangential relation to the equivalent in question, or, in other words, that the narrowing amendment was peripheral, or not directly relevant, to the alleged equivalent." *Id.* Moreover, to rebut the presumption with tangentiality, the reason for the narrowing amendment "should be discernible from the prosecution history record." *Festo IX*, 344 F.3d at 1369. "If the prosecution history reveals no reason for the narrowing amendment, the presumption is not rebutted. Silence does not overcome the presumption." *Honeywell II*, 523 F.3d at 1315-16 (internal citations omitted).

The rewriting of dependent claims into independent form coupled with the cancellation of the original independent claims creates a presumption of prosecution history estoppel. *See Honeywell Int'l. v. Hamilton Sundstrand, Corp.*, 370 F. 3d 1131, 1134 (Fed. Cir. 2004) (en banc) ("*Honeywell*"); *Felix*, 562 F.3d at 1182. When the presumption applies, a court must presume that the patentee is precluded from using the doctrine of equivalents to prove infringement. *Festo*, 535 U.S. at 733-34.

Here, original claim 1 read as follows:

> 1. (original) A method for controlling computer network access, the method comprising the steps of:
>
> (a) initiating at a client computer a first communication session at a first network address;
>
> (b) receiving at the client computer via the first communication session a second network address;
>
> (c) initiating at the client computer a second communication session at the second network address;
>
> (d) receiving at the client computer via the second communication

session an access configuration including a control setting for at least one communication protocol capable of being utilized during a third communication session;

(e) instantiating on the client computer a process which initiates a third communication session at a third network address; and

(f) in connection with the third communication session, controlling the conveyance of data at least one of (i) to and (ii) from the process instantiated on the client computer based on the control setting for the one communication protocol.

(D.I. 75-6 at JA0376) Original claims 9 and 10 read:

9. (original) The method as set forth in claim 1, wherein step (f) further includes the steps of:

determining from the conveyed data the communication protocol thereof; and

determining from the thus determined communication protocol the control setting therefor.

10. (original) The method as set forth in claim 9, further including the step of transferring at least part of the conveyed data to the second network address via the second communication session.

(*Id.* at JA 0378)

During prosecution, claims 1 and 9 were rejected based on U.S. Patent No. 7,113,994 to Swift ("Swift") and U.S. 2006/0077977 to Caronni ("Caronni") (*see* D.I. 75-7 at JA0535-38) but claim 10 was found allowable if rewritten in independent form (*id.* at JA0547). The applicants challenged the PTO rejection of original claim 1 through appeal. (D.I. 75-8 at JA0603) The Board of Patent Appeals and Interferences ("BPAI") affirmed the Examiner's rejections. (D.I. 75-9 at JA0663-65) Following the BPAI decision, on January 14, 2011, applicants cancelled original claims 9 and 10, and rewrote original claim 1 to incorporate the limitations recited in

17

original claims 9 and 10. (*Id.* at JA0670-73)

> Amended claim 1, with the amendments underlined, reads:
>
> > 1. (amended) A method for controlling computer network access, the method comprising the steps of:
> >
> > (a) initiating at a client computer a first communication session at a first network address;
> >
> > (b) receiving at the client computer via the first communication session a second network address;
> >
> > (c) initiating at the client computer a second communication session at the second network address;
> >
> > (d) receiving at the client computer via the second communication session an access configuration including a control setting for at least one communication protocol capable of being utilized during a third communication session;
> >
> > (e) instantiating on the client computer a process which initiates a third communication session at a third network address;
> >
> > (f) in connection with the third communication session, controlling the conveyance of data at least one of (i) to and (ii) from the process instantiated on the client computer based on the control setting for the one communication protocol, <u>wherein the one communication protocol is determined from the conveyed data, and the control setting is determined from the thus determined communication protocol; and</u>
> >
> > <u>(g) transferring at least part of the conveyed data to the second network address via the second communication session.</u>

(*Id.* at JA0671) (amendments underlined) Amended claim 1 was subsequently issued.

Plaintiffs here allege that SpectorSoft directly infringes claim 8 of the '237 Patent, which depends on claim 1. Plaintiffs admit that SpectorSoft does not literally infringe the "via the second communication session" limitation of element 1g of claim 1 (which is also, of course, an

18

element of dependent claim 8). (D.I. 320-21 at SS1465) Plaintiffs contend that SpectorSoft's accused product Spector360 meets element 1g only under the doctrine of equivalents. (D.I. 320-3 ¶ 1015) SpectorSoft responds that because of prosecution history estoppel, Plaintiffs are barred from alleging infringement of claim element 1(g) by equivalents.

During prosecution of the '237 patent, the Examiner noted that Swift disclosed claim limitations (c), (d), (e), and (f) of original claim 1 and that Caronni disclosed claim limitations (a) and (b), rendering original claim 1 obvious in light of the combination of these two references. (D.I. 75-7 at JA0539-40) On appeal, the BPAI affirmed. (D.I. 75-9 at JA0664) In affirming the Examiner's rejection, the BPAI noted that "[a] person of ordinary skill in the art would clearly understand from Swift that there is a mutual access control between the target service 76 and the authorized proxy client 74." (*Id.* at JA0666) The prosecution history is otherwise silent on the rationale behind allowing claim 10 as an independent claim. (*Id.* at JA0675; D.I. 75-7 at JA0547) There was no appeal of the Examiner's decision that claim 10 had to be rewritten in independent form to be allowable.

Plaintiffs contend that original claim 10 was allowed because it included the "transferring at least part of the conveyed data to the second network address" limitation and that the "via the second communication session" limitation was tangential to the amendment. Plaintiffs find support in the BPAI statement that "[a] person of ordinary skill in the art would clearly understand from Swift that there is a mutual access control between the target service 76 and the authorized proxy client 74." However, this statement addressed the limitations that were present in both original claim 1 and the prior art. The BPAI was not addressing original claim 10 when it made this comment. Neither the BPAI nor the Examiner ever addressed whether original claim

19

10 was allowable because it required the "transferring of at least part of the conveyed data to the second network address" or because it also required such transferring to occur "via the second communication session." On this point, the prosecution history is silent. Because "the prosecution history reveals no reason for the narrowing amendment" and "[s]ilence does not overcome the presumption" of prosecution history estoppel, Plaintiffs are barred from asserting infringement of claim element 1(g) by doctrine of equivalents. *See Honeywell II*, 523 F.3d at 1315-16 (internal citations omitted). Furthermore, because Plaintiffs only allege infringement of the '237 Patent pursuant to the doctrine of eqivalents, SpectorSoft Corporation's Motion for Partial Summary Judgment of Non-Infringement of the '237 Patent is granted.

### D. SpectorSoft Corporation's Motion for Partial Summary Judgment of Non-Infringement of the '571 Patent (D.I. 330)

Plaintiffs have stipulated to non-infringement of the '571 Patent under the Court's construction of the "real-time term" in Claim 4(b)(2), as SpectorSoft's accused product stores data before transferring it. Accordingly, SpectorSoft Corporation's Motion for Partial Summary Judgment of Non-Infringement of the '571 Patent is granted.

### E. SpectorSoft Corporation's Motion for Partial Summary Judgment of Non-Infringement of the '304 Patent (D.I. 331)

SpectorSoft argues that Plaintiffs cannot prove direct infringement of the '304 Patent. According to SpectorSoft, Plaintiffs' only infringement theory requires SpectorSoft's customers to "chang[e] the location of a Data Vault server, updat[e] user (monitored) computers with the new server location in one of several possible ways while the user computer was recording an ongoing Internet session, and upload[] data to the new Data Vault server before rebooting the user computer and while the same monitored Internet session was still ongoing." (D.I. 331-1 at

1) According to SpectorSoft, "[t]here is no evidence that Plaintiffs' hypothetical infringement scenario has ever occurred." (*Id.*) SpectorSoft acknowledges that Plaintiffs also allege infringement based on SpectorSoft's testing of its software, provision of technical support to its customers, and creation of user guides and manuals that provide changing server locations and configurations. According to SpectorSoft, however, the evidence supporting this infringement theory is speculative and warrants dismissal of Plaintiffs' direct infringement claim. SpectorSoft also argues that all of Plaintiffs' indirect infringement claims fail because (i) Plaintiffs cannot prove direct infringement, (ii) there are substantial non-infringing uses of the accused products, and (iii) Plaintiffs cannot prove specific intent to induce infringement.

In response, Plaintiffs attempt to identify several fact questions that they claim preclude summary judgment. Plaintiffs argue that they are not limited to arguing infringement only when the Data Vault server is moved. (D.I. 377 at 20-22) Plaintiffs point to their infringement contentions, which state that "[i]n a specific infringing configuration, Spector CCS transmits the Internet server address and port number corresponding to the Spector Data Vault." (D.I. 381 Ex. J at 84) Subsequently, Plaintiffs provided another interrogatory response in which they stated that "[i]f the Data Vault's location has changed, the server (monitoring computer) sends the updated address and port number of the new location to the user computer." (D.I. 320-33 at 48) While SpectorSoft insists that the latter response narrowed the former, in the Court's view the latter simply provided an example of when, according to Plaintiffs, infringement occurred.[3]

---

[3]Supporting this view is the fact that, when addressing infringement of the '304 Patent by the Spector360 technology in his infringement report, Dr. Nettles' primary infringement theory remained that "[c]hanges in the static IP addresses *such as* addition of a new Data Vault server are communicated to the client computer . . . ." (D.I. 320-2 ¶ 102) (emphasis added) Similarly, in his deposition, Dr. Nettles testified that his infringement scenario required that the client be

21

SpectorSoft further argues that the Court prohibited Plaintiffs from alleging infringement when the Data Vault is not moved when the Court denied Plaintiffs' request to file a supplemental expert report on infringement. (*See* D.I. 344 at 15-17) This is not correct. The Court disallowed Plaintiffs' expert, Dr. Nettles, from filing a supplemental report because Plaintiffs had not shown good cause for why the new matter addressed in Dr. Nettles' supplemental report was not included in the original reports. (*Id.*) But the Court did not preclude Plaintiffs from presenting theories that they had already disclosed to SpectorSoft.

Plaintiffs allege that the accused software performs the methods of the '304 Patent when it is used in the default configurations to perform a Profile Update (which triggers every 300 seconds by default) coupled with the Control Center Sever (CCS) and monitor Internet activity at the endpoint. SpectorSoft essentially argues that Plaintiff has provided no evidence that anyone has actually performed all of these steps. However, Plaintiffs contend following the directions in SpectorSoft's manuals would result in infringement of the '304 Patent and that there is strong circumstantial evidence that SpectorSoft's customers do, in fact, follow these directions. (*See* D.I. 377 at 24) There is a genuine dispute of material fact as to whether any SpectorSoft customers performed those steps together or in the order required by the '304 Patent.

Additionally, fact questions exist as to the substantiality of the alleged non-infringing use because of the frequency with which the Profile Update feature is triggered. This precludes a finding of no contributory infringement. As of at least September 2011, SpectorSoft may have known of the patents-in-suit but it still allegedly provided instructions directing and encouraging

---

updated with "a new or changed address for the Data Vault," not always that the Data Vault obtain a new address. (D.I. 320-21 at SS01410)

users to use the Profile Update feature. Summary judgment for SpectorSoft would not be appropriate on Plaintiffs' claims of contributory and induced infringement.

Accordingly, SpectorSoft Corporation's Motion for Partial Summary Judgment of Non-Infringement of the '304 Patent is denied.

## F. SpectorSoft Corporation's Motion for Partial Summary Judgment of Non-Infringement by Spector PRO, eBlaster and eBlaster Mobile (D.I. 338)

SpectorSoft argues that it is entitled to partial summary judgment of non-infringement of the patents-in-suit with respect to Spector Pro, eBlaster, and eBlaster Mobile because Plaintiffs have provided no evidence to support a claim of infringement. (D.I. 338 at 1) Plaintiffs admit that they have not produced such evidence. (D.I. 370 at 1-2) Plaintiffs nonetheless oppose SpectorSoft's motion because, they contend, there is no longer a case or controversy on this issue, as they have "voluntarily dropped their claims against these products during discovery." (*Id.* at 2)

The Court disagrees with Plaintiffs. SpectorSoft has filed a counterclaim seeking a declaratory judgment of non-infringement. (D.I. 12 at 7) Additionally, Defendants have not agreed to Plaintiffs' proposed stipulation of dismissal. Therefore, there remains a case or controversy regarding non-infringement by Spector PRO, eBlaster, and eBlaster Mobile.

A party is entitled to summary judgment of non-infringement when it files a "motion stating that the patentee had no evidence of infringement and pointing to the specific ways in which accused systems did not meet the claim limitations." *Exigent Tech., Inc. v. Atrana Solutions, Inc.*, 442 F.3d 1301, 1309 (Fed. Cir. 2006). In its motion, SpectorSoft showed that Plaintiffs have no evidence of infringement. However, SpectorSoft failed to point out specific

23

ways in which its accused products do not meet the claim limitations. (*See* D.I. 338 at 1) This failure would have resulted in a denial of SpectorSoft's motion but-for the fact that, subsequently, in responding to Plaintiffs' later motion seeking leave to amend the complaint (D.I. 443) – a motion that stemmed directly from the parties' dispute over the justiciability of this summary judgment motion – SpectorSoft demonstrated that "Spector Pro, eBlaster Mobile, and eBlaster do not employ a client-server architecture" as required by the patents-in-suit (D.I. 446 at 5). This uncontested evidence of non-infringement "point[s] to [a] specific way[] in which [the] accused systems [do] not meet the claim limitations." *Exigen Tech.*, 442 F.3d at 1309.

Accordingly, SpectorSoft Corporation's Motion for Partial Summary Judgment of Non-Infringement by Spector PRO, eBlaster and eBlaster Mobile is granted.

## G. SpectorSoft Corporation's Motion for Partial Summary Judgment of No Willful Infringement (D.I. 339)

SpectorSoft argues that it is entitled to partial summary judgment of no willful infringement of the patents-in-suit with respect to Spector Pro, eBlaster, and eBlaster Mobile because Plaintiffs have provided no evidence to support a claim of willful infringement. (D.I. 339 at 1) Plaintiffs do not contest this point. (D.I. 370 at 1-2) Plaintiffs again contend that because they had "voluntarily dropped their claims against these products during discovery," this dispute over willful infringement is nonjusticiable. (*Id.* at 2) However, for the reasons discussed above with respect to SpectorSoft's Motion for Partial Summary Judgment of No Infringement by Spector PRO, eBlaster and eBlaster Mobile (D.I. 338), the Court finds that there is a live case or controversy with regard to SpectorSoft's willful infringement.

"[T]o establish willful infringement, a patentee must show by clear and convincing

24

evidence that the infringer acted despite an objectively high likelihood that its actions constituted infringement of a valid patent." *In re Seagate Tech., LLC*, 497 F.3d 1360, 1371 (Fed. Cir. 2007). Plaintiffs here have provided no evidence that SpectorSoft either infringed or did so with an objectively high likelihood of infringement with respect to the Spector PRO, eBlaster or eBlaster Mobile products. As such, Plaintiffs have failed to meet their burden and SpectorSoft's motion is granted.

## H. SpectorSoft Corporation's Motion for Partial Summary Judgment Regarding Limitations on Damages (D.I. 337)

SpectorSoft argues that it is entitled to partial summary judgment of no liability for damages (1) for contributory infringement or inducement to infringe before January 2012 because SpectorSoft had no knowledge of the patents-in-suit before then; (2) for direct infringement based on sales of its software because sales alone cannot constitute direct infringement; and (3) for sales of Accused Products to licensees outside the United States because there can be no liability unless a patented method is performed entirely in the United States.

Under the Patent Act, "[w]hoever actively induces infringement of a patent shall be liable as an infringer." 35 U.S.C. § 271(b). An "alleged infringer must be shown . . . to have *knowingly* induced infringement, not merely knowingly induced the acts that constitute direct infringement." *Commil USA, LLC v. Cisco Sys.*, 720 F.3d 1361, 1367 (Fed. Cir. 2013) (emphasis in original). To prove contributory infringement, the patentee must prove that the defendant "knew that the combination for which its components were especially made was both patented and infringing." *Lucent*, 580 F.3d at 1320. The scienter element of induced and contributory

infringement can be satisfied with evidence of either actual knowledge or willful blindness that the induced acts constituted patent infringement. *See Global-Tech Appliances, Inc. v. SEB S.A.,* 131 S. Ct. 2060, 2068 (2011). "[A] willfully blind defendant is one who takes deliberate actions to avoid confirming a high probability of wrongdoing and who can almost be said to have actually known the critical facts." *Id.* at 2070-71. "By contrast, a reckless defendant is one who merely knows of a substantial and unjustified risk of such wrongdoing and a negligent defendant is one who should have known of a similar risk but, in fact, did not." *Id.* at 2071 (internal citations omitted).

SpectorSoft claims that it did not have knowledge of the patents-in-suit until January 12, 2012, when a customer informed SpectorSoft that Plaintiffs had sued Awareness for patent infringement. Plaintiffs counter that Plaintiff Pearl issued a public statement in September 2011 indicating that Pearl Echo was protected by the patents-in-suit, and the June 2007 release of Pearl Echo 8.0 was accompanied by user guides which stated that the software may be protected by "patents, patent applications, trademarks, copyrights, or other intellectual property rights covering subject matter in this document." (D.I. 369 Ex. B at i) Although Plaintiffs do not provide direct evidence of knowledge or willful blindness, they contend that circumstantial evidence – including the small and highly competitive market for monitoring software, in which Pearl and SpectorSoft compete, as well as evidence that SpectorSoft reviewed and analyzed the products of its competitors – supports a finding of SpectorSoft's knowledge or willful blindness.

Plaintiffs essentially argue that because of the small and highly competitive nature of the relevant market, SpectorSoft was at least willfully blind to its alleged infringement because the user guides to Pearl Echo 8.0 stated that "Pearl Software may have patents, patent applications,

trademarks, copyrights, or other intellectual property rights covering subject matter in this document." (*Id.*) However, willful blindness requires "deliberate actions to avoid confirming a high probability of wrongdoing." *Global-Tech Appliances, Inc.*, 131 S. Ct. at 2070. This requirement is not satisfied by evidence of what the defendant should have known or was reckless in not knowing that it was engaged in wrongdoing. *See id.* Plaintiffs have provided no evidence, either direct or circumstantial, that SpectorSoft had actual knowledge of the patents in suit. Additionally, Plaintiffs have also failed to provide any evidence showing a deliberate act by SpectorSoft to avoid learning about the patents-in-suit or its potential infringement of those patents. Even Plaintiffs admit that the first public statement that Pearl Echo was protected by the patents-in-suit came in September 2011. (D.I. 368 at 1) Therefore, Plaintiffs have failed to provide evidence from which a reasonable jury could find that SpectorSoft gained knowledge of or was willfully blind to the patents-in-suit prior to September 2011.

In September 2011, Plaintiffs made public that Pearl Echo was protected by the patents-in-suit. This fact, coupled with the circumstantial evidence discussed above, creates a disputed issue of material fact as to SpectorSoft's knowledge of the patents-in-suit after September 2011. Accordingly, the Court will limit inducement and contributory damages to post-September 2011.

SpectorSoft further seeks summary judgment that it is not liable for direct infringement damages based on sales of the accused products to its customers. (D.I. 337-1 at 4) Plaintiffs do not contest this portion of SpectorSoft's motion. (D.I. 368 at 3-4) Plaintiffs seek to utilize sales of the accused products to calculate damages for indirect infringement. (*See id.* at 3 n.5)

Accordingly, the Court will grant in part and deny in part SpectorSoft Corporation's Motion for Partial Summary Judgment Regarding Limitations on Damages by limiting

27

inducement and contributory infringement damages to post-September 2011 and limiting damages from sales of the accused products to indirect infringement damages.

## I.    SpectorSoft Corporation's Motion for Partial Summary Judgment of Invalidity of the '304 Patent (D.I. 334)

SpectorSoft argues that the asserted claims of the '304 Patent are invalid as a matter of law because they are anticipated by the prior art products Omniquad Desktop Surveillance Enterprise ("ODSE") and LapLink. SpectorSoft also argues that the combination of ODSE and File Transfer Protocol ("FTP") renders the asserted claims obvious.

Under 35 U.S.C. § 102, a patent claim is anticipated if each and every limitation of the claim is found, either expressly or inherently, in a single prior art reference. *See Moba v. Diamond Automation,* 325 F.3d 1306, 1321-22 (Fed. Cir. 2003) (internal citation omitted). A claim is obvious "if the differences between the claimed invention and the prior art are such that the claimed invention as a whole would have been obvious before the effective filing date of the claimed invention to a person having ordinary skill in the art to which the claimed invention pertains." 35 U.S.C. § 103. "Obviousness is a question of law based on underlying factual findings: (1) the scope and content of the prior art; (2) the differences between the claims and the prior art; (3) the level of ordinary skill in the art; and (4) objective indicia of nonobviousness [('the *Graham* factors')]." *Kinetic Concepts, Inc. v. Smith & Nephew, Inc.,* 688 F.3d 1342, 1360 (Fed. Cir. 2012). "[E]vidence relating to all four *Graham* factors – including objective evidence of secondary considerations – must be considered before determining whether the claimed invention would have been obvious to one of skill in the art at the time of invention." *Apple Inc. v. Int'l Trade Comm'n,* 725 F.3d 1356, 1365 (Fed. Cir. 2013). Moreover, "[a] party seeking to

28

invalidate a patent based on obviousness must demonstrate by clear and convincing evidence that a skilled artisan would have been motivated to combine the teachings of the prior art references to achieve the claimed invention, and that the skilled artisan would have had a reasonable expectation of success in doing so." *Procter & Gamble Co. v. Teva Pharm. USA, Inc.*, 566 F.3d 989, 994 (Fed. Cir. 2009) (internal citation omitted).

Plaintiffs argue that the prior art references relied on by SpectorSoft neither anticipate nor render obvious the '304 Patent. With respect to ODSE, Plaintiffs argue that their technical expert, Dr. Nettles, found that "ODSE captures screenshots that are based on data found in the computer's framebuffers" which does not meet claim 1's requirement that data associated with the first Internet session at the local computer be stored. (D.I. 373 at 11; D.I. 322 at IA00262-63) SpectorSoft counters that Dr. Nettles' argument lacks merit because the '304 Patent expressly states that "[t]he data associated with the first Internet session can include data previously displayed on the display of the local computer." (D.I. 75 at JA0004 col. 2:1-4) Dr. Nettles responds that screenshots of data stored in a frame buffer is not "data associated with the first Internet session" as required by claims 1-4, 9-10, and 12-14 of the '304 Patent. Dr. Nettles' opinion is not meritless as a matter of law and presents a genuine dispute of material fact that precludes a finding of anticipation of the asserted claims by ODSE.

Plaintiffs further argue that LapLink does not anticipate claims 9-10 and 12-14 of the '304 patent. Dr. Nettles testified that LapLink does not disclose claim limitation 9a because LapLink "provides only an option to add 'Internet Documents.' But the Xchange Agent works to synchronize any type of file between two computers, not just Internet documents . . . These Internet documents can be synchronized without a user participating in an Internet session." (D.I.

29

375 at 4) Thus, he concludes that "LapLink does not teach participation in an Internet session" as required by claim limitation 9a. This genuine issue of material fact which (perhaps among others) precludes a finding of anticipation of the asserted claims by LapLink.

With respect to SpectorSoft's argument that the combination of ODSE and FTP renders the '309 Patent obvious, SpectorSoft make no attempt to show why a person of ordinary skill in the art would be motivated to combine the two references. Nor does SpectorSoft address secondary considerations. Additionally, SpectorSoft fails to show how combining FTP with ODSE satisfies the "data associated with the first Internet session" limitation.

Accordingly, SpectorSoft Corporation's Motion for Partial Summary Judgment of Invalidity of the '304 Patent is denied.

## J.     SpectorSoft Corporation's Motion for Partial Summary Judgment of Invalidity of the '571 Patent (D.I. 335)[4]

SpectorSoft argues that claim 4 of the '571 patent is invalid as a matter of law because it is anticipated by the prior art product LapLink. Plaintiffs respond that SpectorSoft has failed to show how LapLink satisfies claim limitation 4(b)(2), requiring that "real-time data" be

---

[4]As the Court stated during the motions hearing, while the briefing on the pending motions was generally of a very high quality, there was a notable exception in Defendants' briefs supporting their motions for summary judgment of invalidity. (Tr. at 172-74) Defendants' opening brief seeking invalidity of Plaintiff's '571 Patent was barely 2 pages long – but directed the Court to 57 pages of claim charts and expert opinion, all of which SpectorSoft evidently intended the Court to wade through to understand how Defendants had met their clear and convincing burden. Defendants' unhelpful briefs on these motions were undoubtedly the result of an effort to comply with the page limits imposed by the Court (e.g., a total of 50 pages for all opening briefs, no matter how many motions a party files). While Defendants did meet the "letter of the law," in practical effect they evaded the page limits, and presented unhelpful briefing on the invalidity motions. Counsel explained at the hearing that Defendants had to make difficult choices about how to use their allotted pages and even considered not filing the invalidity motions – to which the Court responds that requiring counsel to make such decisions is one of the principal purposes of the page limits.

transmitted from and received at the local user computer. The Court's construction of real-time data requires that the real-time data is not stored in memory. (D.I. 286 at 13) Plaintiffs' expert, Dr. Nettles, has testified that LapLink copies data before sending it across to a guest computer. (D.I. 375 ¶ 14) Because SpectorSoft never addressed this omission, there is at least one genuine dispute of material fact that precludes a finding of invalidity on summary judgment. Accordingly, SpectorSoft Corporation's Motion for Partial Summary Judgment of Invalidity of the '571 Patent is denied.

**K.    Plaintiffs' Motion for Summary Judgment Regarding Defendant SpectorSoft Corporation's Second and Third Affirmative Defenses for Prosecution History Estoppel, Lack of Patentable Subject Matter Under 35 U.S.C. § 101, and Lack of Written Description, Non-Enablement, and Indefiniteness Under 35 U.S.C. § 112 (D.I. 341)**

By way of their motion, Plaintiffs raise three separate groups of issues on which they seek summary judgment. First, Plaintiffs contend that SpectorSoft has failed to produce sufficient evidence to support its prosecution history estoppel defense with respect to the '237 Patent. Second, Plaintiffs argue that SpectorSoft's third affirmative defense for lack of patentable subject matter under 35 U.S.C. § 101 fails because the patents-in-suit are directed to patentable subject matter. Third, Plaintiffs argue that SpectorSoft's affirmative defenses of invalidity due to lack of written description, non-enablement, and indefiniteness under 35 U.S.C. § 112 fail as a matter of law.

The Court has already addressed most of Plaintiffs' arguments regarding prosecution history estoppel with respect to the '237 Patent in its discussion of SpectorSoft's Motion for Partial Summary Judgment of Non-Infringement of the '237 Patent above. Plaintiffs raise one

31

additional argument in their motion. Plaintiffs argue that SpectorSoft made no mention of its

prosecution history estoppel defense in its response to Plaintiffs' contention interrogatory that

was directed specifically to SpectorSoft's prosecution history estoppel defense. In particular,

Plaintiffs correctly note that SpectorSoft never mentioned its prosecution history estoppel

defense in response to Plaintiffs' Interrogatory No. 11, which asked SpectorSoft to: "Explain in

detail the substance and nature of Your contention set forth as Your Second Affirmative Defense

of estoppel including any and all facts you contend support any such contention." (D.I. 343 Ex.

G at 4)

Federal Rule of Civil Procedure 26(e)(1)(A) provides that:

> A party who has . . . responded to an interrogatory . . . must
> supplement . . . in a timely manner if the party learns that in some
> material respect the . . . response is incomplete or incorrect, and if
> the additional or corrective information has not otherwise been
> made known to the other parties during the discovery process or in
> writing . . . .

Although SpectorSoft did not amend its response to Plaintiffs' Interrogatory No. 11, SpectorSoft

did clearly describe its prosecution history estoppel defense in response to a subsequent

interrogatory. In particular, SpectorSoft stated that:

> Plaintiffs cannot demonstrate that Spector360 (or CNE) performs
> the step of "transferring at least part of the conveyed data to the
> second network address via the second communication session"
> under the doctrine of equivalents because substantial differences
> exist between sending data to a second network address that is the
> same address that provided the access configuration in step 1(d),
> and sending data to a different network address. Further, Plaintiffs
> are estopped by arguments made during prosecution of the '237
> Patent from arguing that this step can be met by means of
> transferring data to another network address that is separate and
> distinct from the second network address claimed in step 1(d). See
> 1/9/2006 Remarks at 5-6 (distinguishing U.S. Pat. No. 5,950,195).

32

> Additionally, because the applicant added the limitation in claim 1(g) in order for the claim to be allowable in light of the prior art, Plaintiffs may not broaden the scope of the claim under the Doctrine of Equivalents to recapture subject matter surrendered during prosecution.

(D.I. 343 Ex. I at 18) Thus, SpectorSoft satisfied its Rule 26 obligations by providing Plaintiffs with sufficient notice of its prosecution history estoppel defense. For these reasons, and the reasons stated earlier with respect to SpectorSoft's analogous motion (D.I. 329), Plaintiffs' motion for summary judgment regarding SpectorSoft affirmative defenses of prosecution history estoppel will be denied.

Plaintiffs next argue that SpectorSoft's third affirmative defense for lack of patentable subject matter under 35 U.S.C. § 101 fails because the patents-in-suit are directed to patentable subject matter. SpectorSoft argues that the patents-in-suit are patent-ineligible because they are directed to an abstract idea. Plaintiffs counter that the patents are directed to patent-eligible processes that satisfy the machine or transformation test.

Both sides agree that the '304 and '571 Patents relate to remotely monitoring data associated with an Internet session and the '237 Patent relates to controlling computer network access. (*See* D.I. 342 at 19-20; D.I. 376 at 23-25) SpectorSoft argues that these are "basic concepts" that were "well-understood and routine" and that performing these "well-understood, routine and generic computer functions . . . fails to circumvent the prohibition against patenting abstract ideas." (D.I. 376 at 23) The Court disagrees.

Under 35 U.S.C. § 101, "[w]hoever invents or discovers any new and useful process, machine, manufacture, or composition of matter, or any new and useful improvement thereof, may obtain a patent therefor, subject to the conditions and requirements of this title." There are

33

three exceptions to § 101's broad patent-eligibility principles: "laws of nature, physical phenomena, and abstract ideas." *Diamond v. Chakrabarty*, 447 U.S. 303, 309 (1980). Pertinent here is the third category. "The 'abstract ideas' category embodies the longstanding rule that an idea of itself is not patentable. *Alice Corp. Pty. Ltd. v. CLS Bank Int'l*, 134 S. Ct. 2347, 2355 (2014). "As early as *Le Roy v. Tatham*, 55 U.S. 156, 175 (1852), the Supreme Court explained that '[a] principle, in the abstract, is a fundamental truth; an original cause; a motive; these cannot be patented, as no one can claim in either of them an exclusive right.' Since then, the unpatentable nature of abstract ideas has repeatedly been confirmed." *In re Comiskey*, 554 F.3d 967, 977-78 (Fed. Cir. 2009).

In *Mayo Collaborative Servs. v. Prometheus Labs., Inc.*, 132 S. Ct. 1289 (2012), the Supreme Court set out a two-step "framework for distinguishing patents that claim laws of nature, natural phenomena, and abstract ideas from those that claim patent-eligible applications of those concepts." *Alice*, 134 S. Ct. at 2355. First, courts must determine if the claims at issue are directed at a patent-ineligible concept. *See id.* If so, the next step is to look for an "'inventive concept' – *i.e.*, an element or combination of elements that is sufficient to ensure that the patent in practice amounts to significantly more than a patent upon the [ineligible concept] itself." *Id.*

"Simply appending conventional steps, specified at a high level of generality, [is] not *enough* to supply an inventive concept." *Id.* at 2357 (internal quotation marks omitted) (emphasis in original). In *Bilski v. Kappos*, 130 S. Ct. 3218, 3231 (2010), for example, the Supreme Court held that the claims involved were drawn to the patent-ineligible abstract idea of "hedging, or protecting against risk," which was a "fundamental economic practice." Similarly,

34

in *Alice*, the Supreme Court found that the claims were drawn to the patent-ineligible abstract idea of "intermediated settlement," which was also a "fundamental economic practice." 134 S. Ct. at 2356. In both cases, the Supreme Court found that the additional steps delineated in the claims did not embody an "inventive concept" sufficient to ensure that the patents amounted to something more than a legalized monopoly on the practice of the ineligible fundamental concepts themselves.

In determining if a patent embodies such an inventive concept, courts may consider whether the process "is tied to a particular machine or apparatus" or "transforms a particular article into a different state or thing." *Bilski*, 130 S. Ct. at 3227 ("[T]he machine-or-transformation test is a useful and important clue, an investigative tool, for determining whether some claimed inventions are processes under § 101."). "[T]o impart patent-eligibility to an otherwise unpatentable process under the theory that the process is linked to a machine, the use of the machine must impose meaningful limits on the claim's scope." *CyberSource Corp. v. Retail Decision, Inc.*, 654 F.3d 1366, 1375 (internal quotation marks omitted). To be "a meaningful limit on the scope of a claim," the addition of a machine "must play a significant part in permitting the claimed method to be performed, rather than function solely as an obvious mechanism for permitting a solution to be achieved more quickly." *SiRF Tech., Inc. v. Int'l Trade Comm'n*, 601 F.3d 1319, 1333 (Fed. Cir. 2010). Hence, the "mere recitation of a generic computer cannot transform a patent-ineligible abstract idea into a patent-eligible invention." *Alice*, 134 S. Ct. at 2358. "Given the ubiquity of computers, wholly generic computer implementation is not generally the sort of additional feature that provides any practical assurance that the process is more than a drafting effort designed to monopolize the abstract idea

35

itself." *Id.*

Although the "machine-or transformation test is a useful and important clue" to determining patentability, it is "not the sole test for deciding whether an invention is a patent-eligible 'process.'" *Bilski*, 130 S. Ct. at 3227. "[I]n applying the § 101 exception, [courts] must distinguish between patents that claim the building blocks of human ingenuity and those that integrate the building blocks into something more thereby transforming them into a patent-eligible invention." *Alice*, 134 S. Ct. at 2354 (internal citations omitted). The "concern that drives the exclusionary principle [i]s one of pre-emption." *Id.* That is, where a "patent would pre-empt use of" basic tools of scientific and technological work, *i.e.*, laws of nature, natural phenomena, and abstract ideas, the patent would "impede innovation more than it would tend to promote it, thereby thwarting the primary object of the patent laws." *Id.*

Here, the patents-in-suit are drawn to remotely monitoring data associated with an Internet session and controlling network access. SpectorSoft makes no effort to show that these ideas are fundamental truths or fundamental principles the patenting of which would pre-empt the use of basic tools of scientific and technological work. Although "remotely monitoring data associated with an Internet session" or "controlling network access" may be principles fundamental to the ubiquitous use of the Internet or computers generally, SpectorSoft has provided no support for that position. As such, the Court cannot agree with SpectorSoft that the patents-in-suit are drawn to an abstract idea.

Additionally, even if the asserted claims were drawn to abstract ideas, the claims would remain patentable because they satisfy the machine-or-transformation test. The implementation of the '304 Patent by a computer inserts meaningful limitations by claiming exchanging data over

36

different internet sessions to capture the content of an ongoing Internet communication session. ('304 Patent 1:28-34) Similarly, the '571 Patent claims real-time data capture and transmission and reception, thereby using a computer to "play a significant part in permitting the claimed method to be performed." Finally, the '237 Patent involves the ability to provide access configurations and communication protocols that control computer network access and monitor activity. ('237 Patent 1:54-2:3) These meaningful limitations limit the scope of the patented invention and sufficiently tie the claimed method to a machine. Importantly, both sides concede that none of these limitations could be performed by a human alone. (D.I. 376 at 23; D.I. 342 at 20) Accordingly, the Court finds that the patents-in-suit are not drawn to patent-ineligible subject matter. Plaintiffs' motion for summary judgment regarding SpectorSoft's affirmative defense of lack of patentable subject matter is granted.

Plaintiffs finally argue that SpectorSoft's affirmative defense of indefiniteness under 35 U.S.C. § 112 fails as well. In its invalidity contentions, SpectorSoft argued that Claims 1-8, 11, and 16 of the '304 Patent; Claims 1-6 of the '571 Patent; and Claims 1-6 of the '237 Patent are all invalid for failing to meet § 112's definiteness and/or enablement requirements. (D.I. 434 Ex. M at 17-18) In its brief answering Plaintiffs' motion, SpectorSoft does not support any of these § 112 challenges, but instead asserts for the first time that Claims 9-14 of the '237 Patent are indefinite because Plaintiffs' expert, Dr. Nettles, allegedly took inconsistent positions with respect to the "another Internet session" and "the other Internet session" terms in Claim 9. (D.I. 376 at 26) At least in the context of the instant case, an answering brief to a motion for summary judgment is not the appropriate place to present an invalidity challenge for the first time. Because SpectorSoft provided no evidence to support its properly disclosed indefiniteness

37

challenges, and its newly-articulated challenges are untimely, Plaintiffs' motion for summary judgment regarding SpectorSoft's affirmative defense of indefiniteness is granted.

## L. Plaintiffs' Motion for Leave to Amend the Complaint (D.I. 442)

Plaintiffs seek leave to file a Second Amended Complaint to withdraw their claims against Spector Pro, eBlaster, and eBlaster Mobile. (D.I. 448 at 1) As explained above, the Court has already determined that these products were part of this case as of the filing of the summary judgment motions and, further, that these products cannot on the present record be found to infringe the patents-in-suit. Accordingly, Plaintiffs' motion is denied as moot.

## IV. CONCLUSION

An appropriate order follows.